[Cite as *State v. Perry*, 2016-Ohio-4582.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 26874 |
| | : | |
| v. | : | T.C. NO. 14CR292 |
| | : | |
| JASON E. PERRY | : | (Criminal appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___24th___ day of _____June_____, 2016.

. . . . . . . . . . .

MICHELE D. PHIPPS, Atty, Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

DONALD GALLICK, Atty. Reg. No. 0073421, 190 North Union Street #102, Akron, Ohio 44304
     Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Jason Perry, filed October 22, 2015. Perry appeals from the September 24, 2015 "Decision, Order and Entry Granting in part and Denying in part Respondent's Motion to Strike Defendant's Amended Petition for Post-Conviction Relief; Denying Respondent's Renewed Motion to

Dismiss; and Granting Respondent's Renewed Motion for Summary Judgment." We hereby affirm the judgment of the trial court.

{¶ 2} By way of background, we note that this Court affirmed Perry's conviction on one count of aggravated burglary in *State v. Perry*, 2d Dist. Montgomery No. 26421, 2015-Ohio-2181, wherein the relevant facts and course of proceedings were set forth as follows:

On March 11, 2014, Perry was indicted for one count of aggravated burglary in violation of R.C. 2911.11(A)(1), a felony of the first degree; one count of abduction in violation of R.C. 2905.02(A)(2), a felony of the third degree; and one count of disrupting public services in violation of R.C. 2909.04(A)(3), a felony of the fourth degree. Perry pled not guilty to the charges and a four-day jury trial was held on August 4 through August 7, 2014. At trial, the State presented testimony from the victim, Jennifer Crider, who was Perry's girlfriend at the time of the alleged offenses. In addition, the State presented testimony from Crider's friends, Jordan McClain and Jason Farr, as well as Crider's father, Jeffrey Crider, and the investigating police officer, Mark Allison.

Jennifer Crider testified that she and Perry met online in May 2013 through an online dating website. According to Crider, she later met Perry in person in June 2013 and entered into a romantic relationship with him after a few months of dating. Their relationship became more serious over time; however, Crider, who lived with her two daughters and Jordan McClain, testified that Perry did not reside with her or have a key to her

home.

Continuing, Crider testified that at the end of December 2013, she and Perry went on vacation to Gatlinburg, Tennessee, and then returned to her home in West Carrollton, Ohio, on New Year's Eve. After they returned to her house, Crider testified that they began drinking whiskey to celebrate the New Year. Crider's two daughters were not at home that night, but McClain and Jason Farr were there celebrating with Perry and Crider. As part of the celebration, Crider testified that she had four or five half shots of whiskey, whereas Perry had four to five full shots of whiskey and two large glasses of whiskey and soda. During the course of their celebration, Crider testified that Perry became drunk. Crider testified that Perry was acting very happy and also strange, as he appeared to be flirting with McClain, who is male. In addition, Crider testified that later on in the evening, Perry entered the kitchen wearing only his boxer shorts, a t-shirt, and cowboy boots. At that point in time, Farr was the only other person with them in the house, and Crider testified that Farr left shortly thereafter.

Once McClain and Farr were gone, Crider testified that she and Perry began to have sex in her bedroom. Crider explained that over the course of their relationship, she and Perry had engaged in "rough sex," which she defined as pulling hair, biting, smacking, and scratching on certain areas. She testified that on the night in question, she and Perry engaged in some of these activities, but claimed that the sex was not physically rough and did not last very long. Trial Trans., Vol I (Aug. 4, 2014), p. 15–16. Crider further

testified that in the past, Perry had enjoyed it when she told him that he was not pleasing her. However, when Crider informed Perry that he was not pleasing her on the night in question, Crider claimed that Perry "freaked out" and told her that he was going to leave. In response, Crider said she told Perry: "I think it's a good idea if you leave now, and I'm going to do the same." Trial Trans., Vol. I (Aug. 4, 2014), p. 16.

Following her request for Perry to leave, Crider testified that she tried to grab her phone to call McClain, but that Perry took her phone and told her she was not calling anyone. Crider then testified that Perry grabbed her throat, pushed her across the bed and onto the floor while shouting expletives at her. As she was being choked, Crider noticed the candles in her bedroom had been knocked on the floor and she claimed that Perry stopped choking her so that they could pick up the candles. After tending to the candles, Crider testified that she ran to the front door in an attempt to leave, but Perry caught her and pinned her down with his legs. Crider claimed that her back was against the ground with Perry on top of her hitting her multiple times on the chest and at least once on the jaw. Crider testified that as she tried to fight off Perry she told him: "Please get off me. Please get out of my home. People are going to know you did this to me. You need to leave. I need my phone. Give me my phone." *Id.* at 22. According to Crider, Perry responded: "I'm not leaving and neither are you. Nobody is leaving. You're not going to call the cops. You're not going to keep me from my kids." *Id.* at 23.

Crider testified that after several minutes of fighting, she decided to stop struggling because it was just making Perry more aggressive. She said that when Perry eventually let her up she offered him $1,000 to leave. Crider explained that $1,000 was double the amount she owed him for her half of the Gatlinburg vacation. According to Crider, Perry refused her offer and instead demanded $3,000. Crider explained that she did not have that kind of money, but wrote Perry a $1,000 check, which she later ripped up when it became clear that Perry was not going to leave.

Crider then testified that she sat on the arm of her couch near a window and drew the curtains open so someone might see her. Meanwhile, Crider testified that Perry was pacing back and forth in her house and yelling in her face. While Perry was pacing, Crider testified that she unlocked the window and climbed through it to escape. She claimed that when Perry ran out the front door after her, she was able to run back inside and lock the front door. However, by the time she locked the door, Perry had already climbed back inside her house through the unlocked window. After they were both back inside the house, Crider testified that she returned to the arm of the couch and Perry continued pacing She testified that while all this was going on, she continually asked Perry to give her phone back and to get out of her house, but he still refused to leave.

Since Perry would not leave and would not let her call the police, Crider testified that she told him to call anybody of his choosing because someone else needed to be there with them. According to Crider, Perry

called the mother of his children, Lisa Langley. Crider testified that while Perry had Langley on speaker phone, she told Langley: "I'm not okay. He choked me. He hit me. He hurt me. And he refuses to leave my home. I am not okay." Trial Trans., Vol. I (Aug. 4, 2014), p. 33. Perry then told Langley that "it was rough sex, that we were just having sex, and that's all." *Id.*

While Perry was talking with Langley, Crider testified that Perry began bringing his belongings and some of her own belongings to the front door. Crider testified that when Perry eventually left, he had taken a pair of her diamond earrings, her cell phone, and the gifts he had purchased her for Christmas. Crider later realized that he had also taken the ripped up check and cashed it using his camera phone.

After Perry left Crider's house, Crider testified that she locked all of her doors and left messages on Facebook for McClain and Farr asking them to come help her because Perry "went crazy" and she was scared. Crider testified that when McClain subsequently returned home, they slept for a few hours and then went to the West Carrollton police station where she reported the incident and had photos taken of her injuries. At trial, Crider confirmed that all of her injuries were inflicted by Perry during the early morning hours following their New Year's Eve celebration.

McClain also testified at trial. According to McClain, Crider had no bruises or scratches on her body when he left her on New Year's Eve. However, McClain testified that upon receiving Crider's messages and returning home the next morning, he observed scratches and bruises on

her neck, collar bone, and chest. McClain also testified that Crider was frantic and scared. Like McClain, Jason Farr also testified that he saw no bruises on Crider at the New Year's Eve party, and confirmed that he had received messages from Crider asking for help early the next morning. In addition, Crider's father testified that on the morning of the incident, Crider had a swollen jaw, bruised arms, and was physically shaking.

Officer Mark Allison of the West Carrollton Police Department testified that he was the investigating officer assigned to the case after Crider reported the incident. Allison testified that when he interviewed Crider on January 2, 2014, he saw a yellow bruise on her jaw, numerous bruises on her upper chest and forearms, and scratches on her neck. Allison took additional photos of Crider's injuries as well as photos of her house. Allison further testified that he contacted Perry and that Perry denied having Crider's phone or diamond earrings. According to Allison, Perry also claimed that he knew nothing about Crider's bruises.

After the State rested, Perry testified in his defense and also presented testimony from Lisa Langley. Perry's testimony regarding the events of the night in question were in line with Crider's up to the point where everyone left Crider's home on New Year's Eve. Their testimony differed in that Perry claimed that he and Crider had consensual rough sex for a couple of hours, which included some biting and Perry putting his hands on Crider's throat. He also testified that at one point he and Crider "bounced and slid off the bed pretty hard." Trial Trans., Vol. II (Aug. 6, 2014), p. 239. Perry

testified that Crider looked horrified after falling off the bed. He claimed that she made statements about violence and how she thought he was trying to hurt her. Perry, however, testified that he was not trying to hurt Crider and that he never hit her in the chest or face. He also testified that the only injury he inflicted on Crider that night was a bite mark on her chest, which he claims was the product of consensual rough sex.

Additionally, Perry claimed that the cell phone he took from Crider was his phone. Perry testified that upon taking his phone, he called Langley and spoke with her while he collected his belongings. At trial, Perry identified phone records showing calls made from his phone to Langley early that morning. As Perry was talking to Langley, Perry testified that Crider jumped out the window. After Crider did this, Perry claimed that he exited the front door of the house to put his belongings in his car. He then testified that he realized he left his wallet and watch inside the house, so he tried to go back inside to get them, but Crider ran back in the house and locked the door. Perry testified that in order to retrieve his wallet and watch, he went through the unlocked window and then left.

Perry admitted that he took a necklace he had purchased Crider for Christmas, but claimed that he did not take her diamond earrings or cell phone. As for the $1,000 check, he testified that Crider had written the check to him earlier on New Year's Eve as repayment for their vacation, and that he had put the check in his wallet. When he went through the window to get his wallet, he claimed that the check had been removed and ripped

into pieces, which he took with him.

Perry's witness, Lisa Langley, testified that Perry called her around 3:10 a.m. on January 1, 2014, and asked if she would stay on the phone with him. Langley testified that during the call, Perry was trying to get his belongings out of Crider's house so that he could leave because he said Crider was acting crazy. She claimed that Crider got on the phone with her and said "he choked me," and Perry responded "[y]eah, that was during sex. * * * [I]f you feel like something is wrong, why don't we just call the police?" Trial Trans., Vol. II (Aug. 6, 2014), p. 280. According to Langley, Crider did not want to call the police. Langley also remembered Perry mentioning that Crider went out the window. In addition, Langley testified that Perry told her over the phone that he forgot his wallet and watch and that he had to go back in the house to retrieve them. Langley then testified that Perry's phone went dead, and that he called her back shortly thereafter as he was driving to her house.

After hearing all the testimony and reviewing the evidence, the jury found Perry guilty of aggravated burglary, but not guilty of abduction or disrupting public services. The trial court then sentenced Perry to community control sanctions for a period not to exceed five years. Perry now appeals from his conviction, raising three assignments of error for review.

*Id.*, ¶ 2-18. This Court determined in part that "there was adequate evidence for the jury to find that Perry trespassed by remaining on Crider's property against her wishes through

force of violence * * *." *Id.,* ¶ 30.

{¶ 3}　Perry filed a "Petition for Post-Conviction Relief" on April 13, 2015. Therein he asserted in part as follows:

* * *

5.　Petitioner alleges that he was deprived of his right to effective assistance of counsel as found in the Sixth Amendment of the U.S. Constitution and Article I of the Constitution of Ohio, leading to his wrongful conviction for Aggravated Burglary.

6.　Petitioner further alleges that he was denied the right to procedural and substantive due process as protected by the Fifth and Fourteenth Amendments of the U.S. Constitution and Article I of the Constitution of Ohio, and that he has actual innocence.

7.　　Factually, Petitioner asserts that his right to effective representation, procedural due process, and substantive due process were violated due to his trial counsel's failure to interview, prepare, and call to the witness stand, multiple witnesses Perry mentioned to trial counsel. * * *

8.　Had trial counsel called these witnesses during the defense's case, the issue regarding trespassing, permission, consent, and withdrawal of consent would have been moot because the witnesses would have shown that Perry and the alleged victim co-habituated (sic) and therefore Perry could not have been convicted of Aggravated Burglary – or any burglary offense as the element of "trespassing" would be negated.

12.　Defendant has a procedural and substantive due process right

to present evidence to disprove an element of a criminal offense of which he/she stands accused. Excluding a witness material to negating the element of an offense, would constitute a due process denial committed by a trial court, and therefore a trial counsel's complete refusal to call witnesses to negate the element of trespassing should also be considered a due process denial where a defendant is convicted of a burglary offense. * * *

  **WHEREFORE**, as Petitioner [has] set forth a prima facie case of ineffective assistance of counsel and the denial of procedural and substantive due process due to the complete failure to call * * * the available witnesses to show Perry was not trespassing in the alleged victim's home but was in fact a lawful resident there, the conviction for Aggravated Burglary is a wrongful conviction. * * *

{¶ 4} Attached in support of the petition were the affidavits of Perry, Ben Aydin, Jorge Gurgel, Lisa Langley, Betty Rowland, and Jonathan Stutzman. Perry averred that he resided with Crider at the time of the offense and was accordingly innocent of aggravated burglary in violation of R.C. 2911.11(A)(1), which provides that "[n]o person, by force, stealth, or deception, shall *trespass* in an occupied structure" in the course of committing the offense. Perry further averred that he "also never assaulted Crider or threatened her with violence on January 1, 2014." According to Perry, he advised defense counsel that he resided with Crider and that multiple witnesses would so testify, but that defense counsel "refused to call any of the witnesses and never argued that I could not be guilty of aggravated burglary because I lived with Crider."

{¶ 5} Aydin averred that he intended to become roommates with Perry in

November 2013 but did not do so because Perry "moved in with his girlfriend at the end of 2013." Gurgel averred that on "December 16, 2013, [he] witnessed a conversation between Jonathan Stutzman and Jennifer Crider and heard Jonathan say how lucky Jason Perry is to be living with her, Jennifer Crider." Langley averred in part that she is Perry's former girlfriend, and that on December 3, 2013, Crider "did confirm that Jason was in the process of moving into her home." Rowland averred that she is Perry's grandmother, and that in December 2013, "Crider told me in conversation that she and Jason Perry were living together." Finally, Stutzman averred that Perry was his student in a martial arts class, and that Stutzman advised Crider in December 2013 that "Jason is very lucky to now be living with her."

{¶ 6} On May 18, 2015, Perry filed a motion for an evidentiary hearing in support of his petition. On June 1, 2015, the State responded to Perry's petition, and on June 22, 2015, the State filed a Motion for Summary Judgment. The State asserted in relevant part that Perry's petition was barred by res judicata. On June 22, 2015, the State filed a "Motion to Dismiss Petition for Post-Conviction Relief," alleging a "failure to comply with Criminal Rule 35" and asserting that the petition lacked substantive grounds for relief.

{¶ 7} On July 1, 2015, Perry filed Petitioner's Response to Summary Judgment, arguing that he "proffered six affidavits that the State's motion for summary judgment does not counter." On the same date, Perry filed "Petitioner's Response to Motion to Dismiss and Alternative Motion to Amend Petition." Perry asserted that many "appellate courts hold that once extrinsic evidence is proffered to a trial court alleging ineffective assistance of counsel, res judicata is not a basis for dismissal," and that this Court "holds that ineffective assistance of counsel is properly raised through a post-conviction petition

when evidence is produced that was not introduced at trial." According to Perry in part, defense counsel "produced multiple affidavits demonstrating that Jason Perry lived with the woman who testified that he committed aggravated burglary. This testimony, had it been produced at trial, would have likely changed the outcome of the first-degree felony charge." Perry asserted that "his attorney refused to inform the jury that he lived with the victim."

{¶ 8} On July 7, 2015, Perry filed a "Motion to Continue July 17, 2015 Evidentiary Hearing," citing the following reasons: "1) since the conference call where both parties agreed to the July 17, 2015 date, the prosecutor has filed two motions seeking to dismiss the case without a hearing, meaning that the subpoenaed witnesses may be traveling to the courthouse in vain," and "2) two of the witnesses subpoenaed by Defendant-Petitioner, have indicated that they are unable to comply with the subpoena due to 'business commitments' and a martial arts event scheduled for July 17, 2015." On July 10, 2015, the trial court granted the motion to continue the evidentiary hearing, noting that a new date "shall be set once the Court has ruled on the State's motions."

{¶ 9} On July 31, 2015, the trial court issued a "Decision, Order and Entry Granting Respondent's Motion for [Partial] Summary Judgment; Denying Respondent's Motion to Dismiss Petition for Post-Conviction Relief; and Granting Petitioner's Alternative Motion to Amend Petition." Regarding the State's motion for summary judgment, the court determined as follows:

> Respondent's initial assertion that Petitioner's ineffective assistance
> of trial counsel claim is barred by *res judicata* due to his failure to raise that
> claim on his direct appeal * * * is not well taken. The ordinary bar of *res*

*judicata* does not apply to post-conviction claims that are based on evidence from outside the record before the appellate court on direct appeal. * * * Such is the case here, where Petitioner's claim relies on the <u>absence</u> from the trial record of certain evidence which Petitioner contends his trial attorney <u>should</u> <u>have</u> presented at trial – *i.e.*, the testimony of several witnesses who purportedly could have negated the trespass element of the burglary charge of which Perry was convicted. * * * To support his current claim, Petitioner does present evidence from outside the trial record, in the form of the affidavits of multiple proposed witnesses. * * * Petitioner thus has overcome the *res judicata* hurdle for obtaining post-conviction relief. * *
*

{¶ 10} The court further determined, however, that the State "has demonstrated the absence of any genuine issue of material fact as to its entitlement to judgment as a matter of law on Petitioner's claim for ineffective assistance of counsel." The court noted that although Perry has proffered affidavits in support of his petition, "the premise underlying Respondent's summary judgment motion is that those affidavits do not qualify as the type of admissible and cogent evidence necessary to sustain Petitioner's claim." The court agreed with the State, noting for example that Gurgel's affidavit is based on hearsay, namely the "unheard and unsworn declaration of someone [Stutzman] not even a party to this prosecution." The court determined that "Gurgel's affidavit is <u>not</u> cognizable proof that Perry was living with the victim at the time of the subject offense, and thus does not suffice to create a genuine issue of fact regarding trial evidence to the contrary, thereby implicating trial counsel's effectiveness due to his failure to present

Gurgel's testimony at trial." The court further concluded that the "proffered affidavits of Ben Aydin and Jonathan Stutzman suffer from similar infirmities." As to the affidavits of Langley and Rowland, the court determined that while those affidavits "<u>do</u> attribute their belief that Perry and Crider were living together directly to statements allegedly made by Crider herself * * * the credibility of those affidavits is suspect" because of Langley's and Rowland's "personal relationship with Perry suggesting that they may be biased witnesses on his behalf." Finally, the court found that Perry's affidavit lacked credibility, in part since it was contradicted by Crider's testimony that Perry did not reside with her or have a key to her residence, and because ample trial evidence cast doubt on his assertion in his affidavit that he never assaulted Crider or threatened her with violence. The court noted that while Langley testified at trial, she never mentioned Perry's "supposed co-habitation with Crider." The court concluded that "Perry's affidavit, like the other affidavits he has presented, is not sufficiently credible to raise a genuine issue of material fact regarding Crider's uncontroverted testimony that Perry did <u>not</u> live with her at the time of the offense." According to the court, "that evidence also is insufficient to support a claim of ineffective assistance based on trial counsel's failure to call those affiants as witnesses at trial, and no evidentiary hearing is necessary as to Perry's petition. Respondent's motion for summary judgment is well taken on that basis."

{¶ 11} Regarding the State's motion to dismiss and Perry's motion to amend his petition, the court concluded that because "the evidence offered in support of Petitioner's ineffective assistance of counsel claim fails to demonstrate the existence of a genuine issue of material fact as to either the deficient performance or the prejudice element of that claim, the appropriateness of judgment in favor of Respondent on that claim is

confirmed for that additional reason." Finally the court found that, pursuant to Crim.R. 35(A), Perry's motion to amend his petition "is well taken," and that the State's motion to dismiss "the remaining procedural and substantive due process claims set forth in Petitioner's petition for failure to comply with Crim.R. 35 will be denied without prejudice." The court ordered Perry to file within 14 days a petition complying with Crim.R. 35.

{¶ 12} On August 12, 2015, Perry's Amended Petition for Post-Conviction Relief was filed wherein he repeated the arguments asserted in his original petition and requested an evidentiary hearing. Attached to the amended petition are the identical affidavits of Perry, Aydin, Gurgel, Langley, Rowland, and Stutzman that were attached to his original petition (Exhibits A –F). Additionally attached are Exhibits G-K, which Perry asserted "show that Perry moved in November of 2013." Exhibit G is correspondence dated December 20, 2013 from Perry to John Williamson, General Manager, Coverall Health-Based Cleaning System, that provides:

> Dear John,
>
> This letter is to advise you that as of November 4th, 2013, I have moved to the Dayton, Ohio area and am in need of information on how to change my address.
>
> I will be on vacation the week of December 23rd through January 5th. And upon my return I would like to see about changing my address to 610 Skyview Dr. West Carrolton, Ohio 45449 permanently.
>
> Also, as this residence is close to the Dayton office located in Miamisburg, OH, I would also like to inquire about the possibility of being transferred to the Coverall of Dayton office?

* * *

{¶ 13} Exhibit H appears to be a checking account statement from an account in Perry's name that reflects an address of 960 Staghorn Drive, Cincinnati (Exhibit H), as well as a November 5, 2013 termination fee. Exhibit I provides that it is Perry's "final bill for electric service at 960 STAGHORN DR." Exhibit J is correspondence dated August 19, 2013 from Perry to "Property Manager" at the Deerfield Apartments in Cincinnati, which provides in part, "I am writing to inform you that I will not be renewing the lease at 960 Staghorn Dr. after the lease ends in November 2013. It is my intention to move on to a new community." Exhibit K is undated handwritten correspondence on "Deerfield Apartments & Townhomes" stationery, signed by Sarah Weiss, leasing agent, that provides: "Deerfield Apartments were taken over after Jason Perry moved out in November, 13. We do not have any information on when he lived here. * * *."

{¶ 14} Finally, Perry attached Exhibits L and M. Exhibit L is the affidavit of John Williamson, which provides that he was Perry's "General Manager at Coverall Health-Based Cleaning System, during and prior to the time this event occurred." Williamson averred that in November of 2013, Perry "asked permission to have his personal mail sent to the office address, informing me that he was moving in with then girlfriend, Jennifer Crider, and wanted to make sure things worked well before he permanently changed his address with the postal office – I gave him permission to do so." Williamson further averred that on December 20, 2013, Perry "notified me in writing that he would like to permanently change his address to Jennifer Crider's" Skyview Dr. address "upon return of his vacation. He further asked to be transferred to the Coverall office in Dayton, as it would have been closer to his new address." According to Williamson, he "was planning

to change Jason Perry's permanent address in the work computer to Skyview Drive, after the New Year and his arrival back to work." Exhibit M is the affidavit of Jeffrey Moore which provides in part that Perry "is the father of my sister's two sons," and that in early November 2013, Moore "helped Jason Perry move his belongings into the home of Jennifer Crider, located at 610 Skyview Drive, West Carrolton, OH 45440." Moore averred that Perry's belongings that were moved "included a number of boxes and multiple luggage bags," and that he and Perry "also moved a set of wicker furniture to the house on Skyview Drive, but he decided to give the set of furniture as a gift for helping him move into his new home with Jennifer Crider."

{¶ 15} On August 25, 2015, the State filed a "Motion to Strike Defendant's Amended Petition for Post-Conviction Relief and Renew Respondent's Motions for Summary Judgment and to Dismiss." On September 4, 2015, Perry filed a "Brief in Opposition to State's Motion to Strike, Motion for Summary Judgment and Motion to Dismiss."

{¶ 16} In its September 24, 2015 order, the trial court determined in relevant part as follows:

> \* \* \*
>
> In short, Petitioner's claims continue to be unsupported by admissible evidence and cogent evidence sufficient to sustain those claims. As determined by this Court in analyzing Petitioner's original petition \* \* \*, and as re-emphasized in Respondent's current summary judgment motion \* \* \* many of the affidavits advanced in support of Perry's petition relate to hearsay testimony that would be inadmissible at trial. Additionally, this

Court is permitted to "judge the credibility of the affidavits in determining whether to accept the affidavits as true statements of fact" for purposes of a R.C. § 2953.21 petition. * * * Having previously articulated its reasons for finding Petitioner's again-proffered affidavits not to be credible * * *, the Court will not repeat those reasons here.

Additional unauthenticated documents appended to Petitioner's latest filing * * * do not dissuade the Court from its earlier conclusion. Although Petitioner suggests that such documents lack authentication only because "the witnesses with personal knowledge of these documents have not yet had the opportunity to take the witness stand" * * *, such lack of in-court testimonial authentication would not have precluded authentication of such documents via affidavit, as expressly contemplated by Civ.R. 56(C). Beyond the fact that such documents have not been presented in an evidentiary form cognizable for Civ.R. 56 purposes is the fact that the content of such documents also falls short of the evidence necessary to sustain Petitioner's claims. Photocopies of a letter and two bills indicating that Petitioner did not renew his lease and also terminated services at a prior address in November 2013 * * * is not definitive proof that Respondent was residing with the subject victim on December 31, 2013 or January 1, 2014.

Similarly, a December 20, 2013 letter from Petitioner advising his employer that Petitioner "would like to see about changing [his] address . . . permanently" to the address where the victim resided * * * - although

corroborated by the affidavit of Petitioner's work supervisor * * * - is simply another example of Petitioner's own self-serving statements offered in support of his current claim.   A court may find that such self-serving evidence lacks the "minimal level of cogency" needed to merit a hearing on a post-conviction petition. * * *   This Court so concludes in this instance. More importantly, that letter's indication that Petitioner was contemplating a "permanent" change of address to the victim's residence only at some later date (*i.e.*, after he returned from vacation on January 5, 2014) * * * suggests that even Petitioner did not consider himself to be "permanent[ly]" residing with the victim as of January 1, 2014, when the charged offense occurred.

Accordingly, even with the additional exhibits offered through his amended petition, the evidence advanced by Petitioner in support of his current claims still fails to reach the threshold of admissible, legally-cognizable evidence sufficient to demonstrate the existence of a genuine issue of material fact regarding the merit of Petitioner's "no trespass" defense to the aggravated burglary charge.   Given that all evidence which might tend to support Petitioner's position also conflicts with evidence actually presented at trial – including the victim's testimony that Petitioner did not live with her, have a key to her residence, or appear on her lease; the testimony of the victim's roommate that only the roommate, the victim and the victim's two children resided at that address; and Petitioner's own testimony that he owned three other residences but "basically lived at her [the victim's] home," thereby acknowledging that the home was the victim's,

not his, and seeming to qualify the nature of his "liv[ing]" there * * * - the Court concludes that Petitioner has not demonstrated circumstances warranting an evidentiary hearing on his amended petition. * * * Respondent is therefore entitled to summary judgment in its favor as to Petitioner's remaining claims in their entirety.

Accordingly, the court entered judgment as a matter of law pursuant to Civ.R. 56 in favor of the State and against Perry on Perry's amended petition "in its entirety."

{¶ 17} Perry asserts a single assignment of error herein as follows:

THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING A CONTINUANCE OF THE SCHEDULED EVIDENTIARY HEARING AND THEN DENYING THE PETITION BEFORE HOLDING THE EVIDENTIARY HEARING.

{¶ 18} According to Perry, "all of the evidence proffered in the twelve exhibits attached to the post-conviction – and amended – petition were not presented to the jury and therefore could not have been raised in the direct appeal." Perry asserts as follows:

The five affidavits attached to his original post-conviction petition merit a hearing. * * * Much of the information contained in these affidavits suggest that Jason Perry had moved in with the alleged victim in the aggravated burglary case, thereby eliminating the crucial element of trespassing.

The Amended Petition listed seven other exhibits showing that Perry moved out of his previous home – and into the alleged victim's home – in November 2013. These exhibits include, inter alia, utility bills, a letter to

Perry's landlord stating his intent to move in November 2013, an affidavit from Jeffrey Moore stating that he helped Perry moving Perry's property into Jennifer Crider's home. * * *

{¶ 19} According to Perry, the "twelve exhibits show – or at least suggest – that Perry was either permanently living or temporarily living with the alleged victim. An evidentiary hearing would have resolved this factual dispute." Perry argues that since defense counsel "failed to use evidence described by the twelve exhibits – evidence which contradicted the State's witnesses – Perry suffered from a deprivation of effective assistance of counsel in violation of the Sixth Amendment of the U.S Constitution."

{¶ 20} Finally, Perry argues as follows:

Perry's twelve exhibits contradicted the victim's testimony, creating an issue of fact of a material element of aggravated burglary: trespassing. This Court has previously affirmed the denial of a post-conviction petition without a hearing because the petitioner failed to show a factual dispute. *State v. Isham*, 97-WL-0296, Montgomery App. No. 15976.

If *Isham* should have been denied an evidentiary hearing because his petition failed to produce an issue of fact, then contrariwise, Perry should have received a hearing since his petition's exhibits did directly contradict the victim on a key element.

{¶ 21} The State responds as follows:

Here, at trial, Perry's defense to the charge of aggravated burglary (physical harm) was that he did not physically harm the victim beyond the injuries that were caused when he and the victim were having consensual

rough sex. * * * A review of the trial transcript reveals that Perry's trial counsel zealously represented Perry. There was no evidence presented to establish that Perry lived with Crider on the date of the offense. The closing arguments are not included in the trial transcript. However, even if Perry is correct that his trial counsel did not argue that he lived with Crider on the date of the offense, trial counsel cannot be faulted for failing to argue facts not in evidence.

{¶ 22} Regarding Perry's affidavit, the State notes that "Crider testified that at the time of the offense she lived at 610 Skyview Drive with her two daughters and roommate Jordan McClain. Crider testified that Perry did not live with her, had never lived with her, did not have a key to her residence, and was not on the lease." Further, according to the State, "McClain testified that Perry never lived at the Skyview address." The State argues, as the trial court found, that "Perry's letter to his employer dated December 20, 2013, further undermined Perry's credibility as to the issue of where he was living on January 1, 2014, the day of the offense," since it "indicates that even he did not consider himself residing with Crider on January 1, 2014, when the offense occurred." According to the State, the trial court "properly found that Perry's own self-serving affidavit was not credible and did not support his ineffective assistance of counsel claim."

{¶ 23} Regarding the other supporting affidavits and documents, the State asserts that they "rely on hearsay or the affiants are relatives of Perry, or otherwise interested in the success of his efforts, and the affidavits contradict the evidence proffered by the defense at trial. Additionally, none of the affidavits support Perry's bare assertion that his trial counsel failed to even interview them about the issue of Perry's place of residence"

at the time of the offense.

{¶ 24} As this Court recently noted in *State v. Perander*, 2d Dist. Montgomery No. 26790, 2016-Ohio-1474, ¶ 13-15:

"Postconviction relief proceedings are not direct appeals of the criminal conviction; instead they function as a collateral, civil attack on the judgment.* * *." *State v. Perkins*, 2d Dist. Montgomery No. 24397, 2011–Ohio–5070, ¶ 9. R.C. 2953.21 governs petitions for postconviction relief and provides in relevant part as follows:

Any person who has been convicted of a criminal offense * * * and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States * * * may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.

R.C. 2953.21(A)(1)(a).

Pursuant to R.C. 2953.21(C): * * * Before granting a hearing on a petition filed under division (A) of this section, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the

supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript.

As this Court has previously noted:

Under R.C. 2953.21, "a criminal defendant seeking to challenge his conviction through a petition for postconviction relief is not automatically entitled to a hearing." *State v. Calhoun*, 86 Ohio St.3d 279, 282, 1999–Ohio–102, citing *State v. Cole* (1982), 2 Ohio St.3d 112. First, the trial court must determine whether there are substantive grounds for relief, i.e., "whether there are grounds to believe that 'there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States.' " *Id.* at 283, quoting R.C. 2953.21(A)(1). * * *

The post-conviction relief statute imposes on a petitioner "the initial burden to submit evidentiary documents containing operative facts sufficient to demonstrate substantive grounds for relief that merit a hearing." *State v. Gapen*, Montgomery App. No. 20454, 2005–Ohio–441, ¶ 21. "Broad conclusory allegations are insufficient, as a matter of law, to require a hearing." *Id.* Additionally, where the

allegations in an affidavit, even if true, do not demonstrate a constitutional violation, no hearing is required. *Calhoun*, 86 Ohio St.3d at 284. To obtain a hearing, a defendant must demonstrate prejudicial error. *Id.* at 283.

*State v. Lenoir*, 2d Dist. Montgomery No. 22893, 2009–Ohio–1275, ¶ 10–11.

{¶ 25} Finally as noted by this Court:

* * *

"[A] trial court should give due deference to affidavits sworn to under oath and filed in support of the petition, but may, in the sound exercise of discretion, judge the credibility of the affidavits in determining whether to accept the affidavits as true statements of fact." *Calhoun* at paragraph one of the syllabus. "The trial court may, under appropriate circumstances in post[-]conviction relief proceedings, deem affidavit testimony to lack credibility without first observing or examining the affiant." *Id.* at 284.

*State v. Moore*, 2d Dist. Clark No. 2014-CA-66, 2015-Ohio-550, ¶ 14.

{¶ 26} "We review the trial court's denial of a petition for post-conviction relief under an abuse of discretion standard. * * * The trial court's decision must be 'unreasonable, arbitrary or unconscionable' to be considered an abuse of discretion. * * *." *State v. Pianowski*, 2d Dist. Montgomery No. 25369, 2013-Ohio-2764, ¶ 14.

{¶ 27} Regarding due process, this Court has previously noted:

The Fifth and Fourteenth Amendments to the United States Constitution provide that no person shall be deprived of life, liberty, or

property without due process of law. The Fourteenth Amendment prohibition is specifically applicable to the states.

It is a well-established principle that notice and hearing, or an opportunity to be heard, are fundamental elements of due process of law. *Stanton v. State Tax Commission* (1926), 114 Ohio St. 658, 151 N.E. 760. In particular, notice and an opportunity to be heard are essential requisites of due process of law in judicial proceedings. *Auglaize Box Board Co. v. Hinton* (1919), 100 Ohio St. 505, 126 N.E. 881. * * *

*State v. Lopez,* 2d Dist. Greene No. 2002CA81, 2003-Ohio-679, ¶ 7-8.

{¶ 28} We initially conclude that the trial court properly characterized the affidavits in Exhibits A – F, and we further agree with the trial court that Exhibits G – K, submitted in support of Perry's amended petition, are unauthenticated documents. We note that Exhibit L relies upon hearsay statements from Perry, and regarding Exhibit M, we agree with the State that in his affidavit, Perry "does not even mention the name Jeffrey Moore as a potential witness that he told his trial attorney about who could testify that he lived with Crider on the date of the offense."

{¶ 29} As noted above, Perry was not automatically entitled to a hearing on his amended petition, and contrary to his assertion, his amended petition does not demonstrate entitlement to a hearing regarding his claim that he was denied substantive and procedural due process. We note that Crider testified as follows when asked about her living arrangements with Perry:

Q. Did, at any point, the two of you live together?

A. No.

Q. * * * Did he have a key to your house?

A. No.

Q. Was he on the lease or anything?

A. No.

{¶ 30} On cross-examination, the following exchange occurred:

Q. Ms. Crider, how often did Jason stay at your house?

A. Anywhere between one to three or four times a week sometimes a week.

Q. And that was pretty much * * * from the summer up until January, correct?

A. From around the end of August timeframe.

Q. * * * Around August, it's anywhere from one to three, four times a week, every week, at your house, correct

A. Sure.

Q. Take it he had a number of items there on his own?

A. No. He carried a bag with him.

Q. He didn't have clothing, toiletries, no personal items that were left there?

A. Maybe, at some point in time, he left a thing here or there. But generally, he took it back with him.

{¶ 31} Similarly, McClain testified as follows:

Q. And where do you currently live?

A. I live in Centerville now. I moved on the 25th of July.

Q. And where did you move from?

A. From 610 Skyview Drive in West Carrollton.

Q. * * * And how long did you live at that address?

A. I lived there almost two years.

Q. And who lived there with you?

A. Jennifer Crider and her daughters, * * *.

* * *

Q. Now did the Defendant ever live with you at the 610 Skyview Drive?

A. No, he didn't live with us.

Q. Do you know if he had a key to the home?

A. Not that I know of.

{¶ 32} In contrast, Perry testified, when asked about his interaction with Crider's daughters, that "[h]er kids, they're great. I mean I had - - *I basically lived in her home.*" We conclude that at trial the jury heard and rejected Perry's claim that he resided with Crider at the time of the offense (a finding affirmed on appeal). We further conclude that Perry's amended petition fails to demonstrate substantive grounds for relief since nothing therein supports his assertion that he was denied notice and opportunity to be heard at trial.

{¶ 33} Finally, to the extent that Perry's amended petition appears to argue, in paragraph 6, that his rights to due process were violated based upon his "actual innocence," in *Herrera v. Collins*, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the United States Supreme Court held that "a claim of 'actual innocence' is not

itself a constitutional claim."

{¶ 34} Since Perry failed to set forth operative facts demonstrating a constitutional violation, and since an abuse of discretion is accordingly not demonstrated in the trial court's dismissal, without a hearing, of Perry's amended petition, Perry's assigned error is overruled. In the absence of prejudicial error, the judgment of the trial court is affirmed.

. . . . . . . . . .

WELBAUM, J., concurs.

FROELICH, J., dissenting:

{¶ 35} The Appellant swears he told his lawyer about Aydin, Gurgel, Langley, Stutzman and Rowland, and he says his attorney told him that "he [the lawyer] chose not to bring up the fact that I lived with [the complaining witness] as a defense."

{¶ 36} Aydin said Appellant moved in with the complaining witness. Stutzman said he told the complaining witness that Appellant was lucky to be living with her; Gurgel said he witnessed Stutzman's statement to the complaining witness. Langley said that the complaining witness confirmed to her (Langley) that Appellant was in the process of moving in with her (the complaining witness). And Rowland said the complaining witness said that she (the complaining witness) and the Appellant were living together.

{¶ 37} All this conflicts with the evidence presented at trial; the jury rejected the claim that Appellant resided with the complaining witness.

{¶ 38} But Appellant presents specific affidavits, especially Langley's and Rowland's, that arguably support his testimony and contradicted the complaining witness's. These are not "broad conclusory allegations." It may well be that some of this evidence is not admissible, or would have been suspect, if not incredible, or that

Appellant never relayed sufficient information to his attorney, or that the attorney made a strategic decision not to interview or call such witnesses, but I would find that the trial court should have held a hearing.

. . . . . . . . . .

Copies mailed to:

Michele D. Phipps
Donald Gallick
Hon. Mary L. Wiseman